WEISS et al. v. HAIGHT & FREESE CO.

(Circuit Court, D. Massachusetts. July 13, 1906.)

No. 208.

1. EQUITY—MASTER'S REPORT—EVIDENCE.

It is not necessary nor usual for a master to report all of the evidence taken before him, unless required by the order of reference.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, § 901.]

2. EVIDENCE—FRAUD BY CORPORATION—LETTERS OF OFFICERS.

If the issue to be determined concerns the honesty or fraud of corporate dealing, letters written by those who control the corporation which describe and characterize its fraud may be given in evidence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, §§ 916, 917.]

3. SAME—PROOF OF KNOWLEDGE OF PERSON DECEASED—STATEMENTS.

Where knowledge, intention, or other mental state of a person deceased is a proper and material fact to be proved in a case, statements of such person in his lifetime, from which such knowledge, intention, or other mental state may reasonably be inferred, are admissible in evidence in an action by his personal representative.

4. CORPORATIONS—INSOLVENCY PROCEEDINGS BY CREDITOR—FRAUDULENT BUSINESS.

Where a corporation represents to the public by advertisement and otherwise that it is doing the business of a legitimate stockbroker, while in fact it carries on merely the business of a bucket shop and makes no real purchases of stocks, using the money of its customers to carry on such business, and being itself insolvent while its officers convert its

property to their own use, a suit in equity will lie by a customer who has paid money to it without knowledge of its fraudulent character, in his own behalf and on behalf of others similarly situated, for the appointment of a receiver and for an accounting and distribution of its assets among its creditors.

In Equity.   On exceptions to report of master.

May 8, 1905, the following bill in equity was filed by complainant, as administratrix of Charles Weiss, deceased:

To the Judges of the Circuit Court of the United States for the District of Massachusetts:

Anna L. H. Weiss, of Needham, in the county of Norfolk and commonwealth of Massachusetts, as she is the administratrix of the estate of Charles Weiss, late of said Needham, deceased, intestate, the plaintiff being a citizen of said commonwealth of Massachusetts, brings this, her bill, against Haight & Freese Company, a corporation incorporated under the laws of the state of New York, but having a usual place of business in Boston in the county of Suffolk and commonwealth of Massachusetts, having appointed the commissioner of corporations of said commonwealth its attorney for service of process.

And thereupon your orator complains and says that she brings this bill as a creditor of the said defendant on her own account and in behalf of all such other creditors as may choose to join herein. That your orator is informed and believes, and therefore alleges, that the defendant at the times hereinafter mentioned, and thereafter, has pretended to carry on the business of buying and selling stocks, bonds, commodities, and securities upon commission, and to execute orders for the purchase and sale of the same. That, with the purpose of deceiving and defrauding such persons as may be induced to deal with it, the defendant has organized offices to carry on such pretended business in Boston aforesaid, and in New York and Philadelphia, with other branch offices and connections elsewhere. That the said defendant, although authorized by its charter to buy and sell stocks, bonds, and securities upon commission, in reality executes no orders for the purchase or sale of the same, except when it becomes necessary to do so for the purpose of covering up and concealing the real nature of its business, which is in substance to accept all orders for the purchase and sale of any stocks, bonds, commodities, or securities which may be given to it at the market prices, and by inducing its customers to execute powers of attorney or other authority for the purchase and sale of the same, and by permitting customers to trade upon a very slight margin, to take advantage of market fluctuations in such a way that the account of each customer may be pretended and represented to have been sold out at a price showing a loss to such customer. That, in pursuance of the aforesaid fraudulent scheme the defendant charges its customers a commission for the pretended execution of their orders of purchase and a similar commission for pretended execution of orders of sale, and interest computed upon the difference between the amount paid by such customer as margins and the whole market value of the securities supposed to have been purchased as aforesaid, and upon fictitious loans and balances, so that the interest so charged amounts to a very large sum. That, for the purpose of carrying on the said pretended business, the defendant has a special form of contract with its customers, which is as follows:

"When stocks are purchased this order may be executed in any city or place, whether on any exchange through a member thereof and subject to its customs and rules, or by private purchase, as Haight & Freese Company may elect; and any other client of Haight & Freese Company may be the seller. But Haight & Freese Company is not to be obliged to disclose the name of any client in any event. The purchase may be made delivery on purchaser's demand. Haight & Freese Company may pledge for any amount the securities, when bought, mingled with the securities of other customers or of brokers themselves, and may loan any stock, giving bor-

rowers the right to sell and to return different certificates, and may, without any demand of or notice to me whatever, and on any exchange, or by private sale, close out all transactions on margin: (1) As to securities, whenever margin is less than one-half of one per cent. of the aggregate of the par value of all the securities being carried for me on margin, and (2) as to commodities whenever margin is exhausted. All orders to buy, hereafter or heretofore given, are to be considered as subject to the above unless otherwise expressly stipulated therein."

And when stocks are sold, as follows:

"This order may be executed in any city or place, either on any exchange through a member thereof and subject to its customs and rules, or by private sale, as Haight & Freese Company may elect, and any other client of Haight & Freese Company may be the buyer. But Haight & Freese Company is not to be obliged to disclose the name of any client in any event. Haight & Freese Company may, without any demand of or notice to me whatever, and on any exchange, or by private purchase, close out all transactions on margin: (1) As to securities, whenever margin is less than one-half of one per cent. of the aggregate of the par value of all the securities being carried by me on margin, and (2) as to commodities whenever margin is exhausted. All orders to sell, hereafter or heretofore given, are to be considered as subject to the above unless otherwise expressly stipulated therein."

That if the account of any customer dealing with said defendant is not closed out so as to show a loss, or if the result of the double and illegal commissions so charged, and interest charges as aforesaid, do not exceed any apparent profit made by such customer, he is induced to continue his trading until the account shows a loss, or until the same has been closed out for lack of sufficient margin; but in fact no business is transacted, and all transactions are entirely fictitious and fraudulent as against its customers.

That your orator is informed and believes, and therefore alleges that, in pursuance of the above-described fraudulent scheme and pretense, the defendant induced your orator's intestate, Charles Weiss, on or about the 2d day of September, 1902, to begin to give it orders for the purchase and sale of stocks and securities, and induced him to pay to it from time to time between the said 2d day of September, 1902, and the 31st day of January, 1905, various sums of money amounting in the aggregate to $5,380. That the said sums were paid by him to the defendant as margins against his account, and for commissions and interest charged as aforesaid. That the said Weiss was fraudulently induced by said defendant to believe that his orders for the purchase and sale of securities had been duly executed, and that his said transactions had resulted in large losses. That the said Weiss continued to deal with said defendant as aforesaid up to within a short time of his death, which occurred on the 17th day of February in the current year, 1905. That thereafter your orator, being the widow of the said Weiss, having been duly appointed administratrix of his estate, and having duly qualified as such administratrix, had an interview with one of the employés of said defendant with reference to the said account of her intestate, and the said defendant represented to your orator that there was due to her under said account only the sum of $160, as the alleged balance thereof, and falsely pretending and representing that that was the entire amount due to your orator, induced her to accept the same and sign a receipt therefor. That your orator was then ignorant of the fact that the defendant's transactions with her intestate under said account had been fictitious, and that no stocks or bonds had been purchased or sold thereunder; but she has since been informed, and now believes, and therefore alleges, that in fact no actual purchases or sales were made for her intestate under said account, and that the said account was wholly fraudulent and fictitious, and so manipulated as to show a loss of the money paid in as aforesaid. That the defendant now owes your orator the said sum of $5,380 less the said amount of $160 received by her as aforesaid, to wit, $5,220 with interest thereon.

148 F.—26

That your orator is informed and believes, and therefore alleges, that many other persons besides her intestate have been deceived and defrauded in the same manner as above stated. That by means of large advertisements in the newspapers the public have been induced to believe that the defendant is engaged in legitimate business, whereas in fact said business is a mere swindling device known as a "bucket shop." That. the defendant has made and is making large profits from its customers, which its officers and persons controlling its affairs constantly withdraw and convert to their own use. That the defendant has no capital, and keeps no regular books of account, but, in order to conceal the real nature of its business, has prepared and keeps false and fictitious books of account. That the defendant has a large number of creditors and has not sufficient assets to pay their claims, but is carrying on its business operations from day to day by means of the money received from customers dealing with it.

To the end, therefore, that the defendant may, if it can, show why your orator should not have the relief hereby prayed, and may, according to the best of its knowledge and belief, full, true, direct, and perfect answer make, but not upon oath, which is hereby waived, to the allegations herein contained; and, inasmuch as your orator has no adequate remedy at law, she prays:

(1) That a writ of injunction issue restraining the defendant, Haight & Freese Company, its officers, agents, and servants, from paying over or delivering any of the property in its hands or control to any person other than a receiver to be appointed by this honorable court as hereinafter prayed, and restraining and enjoining all other persons or corporations, and particularly all banks, trust companies, and safety deposit companies having in their possession or control any property belonging to said defendant, whether standing in its name or in the name of Charles H. Poor, Jr., manager, or William G. Conkling, or in the name of William H. Lillis, vice president or treasurer, or of one Beardsley, cashier, or in the name of any of the directors of said corporation, including one George G. Turner and Harvey Watson, from paying over or transferring the same to any person other than such receiver, or from permitting the defendant or either of said persons named, other than a receiver of this court, from removing the same; and particularly from allowing the contents of any safety deposit box standing in the name of the defendant or of any or either of said persons mentioned from being withdrawn, except by such receiver, until the further order of this court.

(2) That a proper and suitable person may be appointed to receive, collect, and take possession of all the property of said defendant, including all of its assets, choses in action, accounts and books of account, correspondence, papers, and memoranda, whether in the possession of said defendant, or of either of the persons above mentioned, or of any other person acting in the defendant's behalf, with authority to receive and hold the same as such receiver of this court, until further order of this court.

(3) That an account may be taken of the amount due to your orator, and of such other creditors as may join in this bill, and that such amounts as may be due upon an accounting, as aforesaid, may be ordered to be paid.

(4) That said defendant may be perpetually enjoined and restrained from carrying on the above-described fraudulent business and transactions, and its property may be distributed among its creditors, and that it may be ordered to be dissolved.

(5) That your orator may have such other and further relief in the premises as the nature of the case shall require and to your honors shall seem meet.

And may it please your honors to grant also unto your orator a writ of subpœna to be directed to said defendant Haight & Freese Company, commanding it to appear and make answer to the aforesaid bill of complaint, at a certain time, and to abide by the further order of the court.

After the appointment of a receiver and the filing of an answer and amended answer by defendant, the issues were referred to Marcus Morton, as master, who reported as follows:

In accordance with the order of reference, dated January 25, 1906, I have heard the parties and their counsel, have taken the testimony, and herewith report to the court the findings of fact and conclusions of law on the issues.

The plaintiff, as administratrix of the estate of her husband, Charles Weiss, brought the bill in suit in behalf of herself and all creditors of the defendant corporation to obtain the appointment of a receiver and an accounting.

Ervan E. Chesley, Gilbert R. Ellis, Oscar A. Ritzman, Frederick C. Rafter, Herbert F. Dowell, Peter N. Campbell, Charles R. Coombs, and William M. Silberstein were admitted by the court as parties plaintiff and were heard by the master.

George L. K. Loeser, Marius Berry, Adolph Kaufman, and Samuel Brimberg were also admitted and heard as plaintiffs, but their claims were subsequently withdrawn without prejudice.

The plaintiffs whose accounts were presented claimed to be entitled to recover the amount paid in by them to the defendant company as margins in certain stock transactions, on the ground that the defendant company fraudulently pretended to carry on and held itself out to the public as carrying on a legitimate stock brokerage business, and in pursuance thereof to actually execute orders given by customers for the sale and purchase of stocks and commodities, whereas it was in reality only a "bucket shop" so called, not actually executing customers' orders, but only pretending so to do.

It appeared that the defendant corporation was organized in 1900.

W. H. Lillis and George G. Turner owned practically all the stock, were the officers of the company, and with one Harvey Watson managed the business.

Branch offices were established in some 70 different places throughout the United States; the general method of carrying on the business being the same everywhere.

The defendant's place of business in Boston was at 85 State street. The company occupied the second floor of the building and several floors above. The rooms on the second floor were for customers and were fitted out with all the conveniences necessary to carry on a brokerage business and such as were used by all stockbrokers. There were stock boards and tickers, telephones and telegraph machines, telegraph operators and clerks, and "buy and sell" slips for customers' orders.

The defendant issued and distributed to the public a "Guide to Investors," containing notices from papers referring to them as "Bankers and Brokers," and also published from time to time market letters, in which they advertised themselves as buying and selling stock.

Customers, including all the plaintiffs, who ordered stock bought would receive a notice on a printed form that the stock had been bought. These notices, as also the order slips, contained a provision that the order could be executed on any exchange in any place by private purchase from any other client of the defendant or any one else, and also that the plaintiff could pledge securities mingled with the securities of other clients or its own, or loan such securities, giving the borrower the right to sell and to return other certificates, and also to close out the securities and commodities without notice to customers when the margin reached a certain minimum point.

Statements were also rendered by the company from time to time to customers, including the plaintiffs, in which it appeared that they were charged commissions upon transactions, interest upon the purchase cost of stocks, or commodities bought, and were allowed interest upon the balance in their favor. Dividends declared upon stock alleged to have been bought by defendant for customers and held as security were also credited on customers' accounts. Statements also indicated the stocks of which the customers were "long."

The orders when they were given to the telegraph operator on the second floor at 85 State street were telegraphed to the floor above, where there were other operators to receive the orders from downstairs and from other branch offices.

The orders were handed by the operator to a clerk, who would fill them by putting upon the order a price which he obtained from the stock board or tape. The clerk then signed upon the order the time when and the price at which it was filled, and this information was then telegraphed downstairs.

Among the books of the plaintiff there was found only one which showed that any stocks had been actually purchased, and that book contained relatively but a few transactions. No book or books were found by the receivers showing any loan transactions or deposit of collateral with banks or trusts companies or transactions between the defendant company and a member of any stock exchange. One book showed some transactions between the said Lillis and a firm of brokers named W. X. Fuller & Co., then members of the Boston Stock Exchange, which apparently was a company book, but the transactions were relatively few in number.

There was a Philadelphia wire in the offices, and some orders were apparently transmitted to a broker on the Consolidated Exchange of Philadelphia. There was nothing, however, in the books of the company to indicate how many orders were so executed, and no officer of the company appeared to testify as to such orders.

A card catalogue was kept indicating some few stock transactions.

The accountant for the receivers could not tell from an examination of the books whether or not the defendant company had on hand at any given time stock ordered to be purchased.

In view of the fact that the accounts of the company were carefully kept, the absence of such book or books was significant.

It also appeared that at the time that the receivers took possession there were on hand in the Boston office only about 110 certificates of stock, worth at that time about $13,000, and other certificates worth about $3,000 in the branch offices.

The court subsequently ordered the return of most of these to certain creditors.

None of the certificates which the books of the company indicated that the plaintiffs were "long of" were included in those so found.

The defendant company also used a form of release which is given in full hereafter to protect it against liability under the acts referred to therein and commonly designated as the "Bucket Shop" acts.

The plaintiff also put in evidence the books of the company and statements in the cashier's handwriting apparently made up from the books, checks and check books and account books used by persons claimed and proved to be officers or agents of the company, and the testimony of S. S. Fitzgerald, who was acting for the receivers in taking possession of the assets of the company in explanation of them.

The defendants duly excepted to this line of evidence.

The evidence of the method of conducting the business other than that indicated by the evidence of the books so conclusively established the nature of the business that I excluded from my consideration the somewhat complicated system of keeping the books and the testimony of Fitzgerald in regard to the same.

The evidence clearly showed, and I find, that the defendant company fraudulently held itself out to the public as a legitimate stock brokerage house and as actually buying and selling the securities ordered by customers. Its whole method of advertising, conducting its business, and dealing with customers indicated that it intended that the public should so believe. It was equally clear, and I find, that the defendant company was not conducting such a business, but was in reality running a so-called "Bucket Shop."

The transactions with their customers, although on the face actual transactions, were fictitious ones and were intended by the company to be fictitious, except possibly in a very few instances which did not affect the general practice.

Correspondence between said Lillis and Turner plainly indicated that they considered the business to be illegitimate.

The legal right to recover the amount paid to the defendant company by the various plaintiffs is based upon the proposition that the payment had been

made upon the understanding on the part of the plaintiffs that they should be applied by the defendant company for the purpose of buying stocks to be carried on margins, and that they were received by the defendant company upon the implied agreement that they should be so used, and that they had not been so used.

The proposition assumed that the plaintiffs in each case believed and understood that they and the defendant company were carrying on actual transactions and were not engaged in such gambling transactions as the law stamps as illegal.

Excluding for the present a consideration of the Weiss and Silberstein claims, the evidence was quite clear, and I find, that all the other plaintiffs believed and understood that the company was actually carrying for them on margin the stocks ordered, and that the transactions were actual and legitimate ones.

The method of carrying on business by the defendant company, as has been stated, would naturally induce such a belief and would fairly warrant its inference in the absence of evidence tending to show the contrary.

It also warrants the inference, and I find, that the defendant company agreed to use the margins for the actual purchase of stock.

There was evidence to show affirmatively that the plaintiffs Chesley, Ritzman, and Campbell believed and understood that the defendant company was actually filling their orders. Chesley testified that at times he bought and paid for the shares and received the certificates. Ritzman testified that he did not buy more than he could pay for so that he could take the certificates up if the price went down. Campbell bought and paid for and received in a number of instances the certificates, and testified that he supposed that the defendant company was actually buying the stock for him.

The plaintiff Ellis, as appeared from the cross-examination, never asked for or received any stock. The plaintiff Rafter did not have money sufficient to take up some of his stock and did not want the certificates. The plaintiff Dowell opened an account for margin trading, never called for or desired the certificates, was setting off his purchases against his sales, and "was playing the market for a profit."

Such evidence was not inconsistent with legitimate margin transactions, and did not in my opinion overcome the effect of the other evidence.

I find therefore that the plaintiffs under consideration were led to believe by and did believe that the defendant company was actually buying and selling stock for them, that the defendant company impliedly so agreed, and that it did not keep its agreement.

## Weiss Claim.

The evidence in this claim was contradictory. The same methods were used with Mr. Weiss as with the other customers, and, as has been stated, those methods would naturally lead him to believe that the transactions were real.

The plaintiff Berry testified that he complained to Weiss about the interest charged by the defendant company, and said to him that he, the witness, might as well "go out to a bucket shop," and that Weiss persuaded him from doing so and said it was a first-class house.

The witness also testified that he said to Weiss: "Suppose these shares are not actually bought?" And Weiss said that they were; that they were actually bought on the Exchange in New York, and were held there by the banks who loaned money as collateral.

To meet this evidence the defendants relied upon the testimony of one Stover and six releases which Weiss had signed.

Stover testified that he was a close friend of Weiss, and that he had often talked with him about the business of the defendant company; that Weiss asked him whether the defendant company was a "bucket shop" and was told that it was; that Weiss also asked about the strength of the company and was told that the witness' experience had been satisfactory.

On cross-examination it appeared that the witness took customers to the defendant company and received a percentage of the commission from the customers and the company for so doing.

The releases were as follows:

"Boston.

"Received of Haight & Freese ——— dollars on account, and I hereby release and discharge Haight & Freese Co., its officers, agents, servants and each of them from any and all right of action, claim or demand under or by virtue of chapter 437 [p. 338] of Acts of Massachusetts for the year 1890 or any amendment thereof; or under or by virtue of any law or statute whatever, for any payment at any time heretofore made or value of anything at any time heretofore delivered on any contract or transaction whatever, and I covenant never to sue therefor them or either or any of them and I hereby waive all rights under said. act and under all amendments thereof.

"Witness my hand and seal this ——— day of ———."

These releases, which were used with all customers to whom money was paid, were undoubtedly intended by the defendant company to protect it from claims under the so-called "Bucket Shop Act."

In the absence of other controlling evidence, the signing of such a release would fairly raise a doubt as to the knowledge of a customer of the nature of the transaction.

It is perfectly possible, however, that a customer who was called upon to sign such a release could sign it without appreciating its significance. It seems hardly fair to charge the plaintiff with a knowledge of the fictitious nature of the transaction because he signed such releases when he had been led to believe by repeated actions of the defendant company that the transactions were genuine.

The evidence of Stover, a man working for the defendant's interests, did not carry to my mind the weight that Berry's testimony did. I find that the plaintiff Weiss was led to believe by and did believe that the defendant company was actually buying and selling stock; that the defendant company impliedly so agreed; and that it did not keep such agreement.

A release signed by the plaintiff Mrs. Weiss was also put in evidence. This release under seal was in the same form as the releases signed by Mr. Weiss, except that they were "in full of all demands" instead of "on account."

The release upon its face, as has been stated, was designed to relieve the defendant company from liability under the so-called "Bucket Shop Act," and might fairly be interpreted as being confined to such purpose. I find that all the releases by their terms purported to discharge the defendant company only from liability under the Acts of 1890 therein referred to, and were not intended nor did they discharge the defendant from liability for the claim in suit.

I report the following evidence, and make findings of fact thereon in case my interpretation of the release is erroneous:

Mrs. Weiss testified that, in response to a message purporting to come from the office of the defendant company, she went there on March 31, 1902, with one Schmitt. She asked for the money that was due her husband and upon request showed the certificate of her appointment as administratrix and was given $164.62. She was told by the cashier that it was all that was due. She started to go out with the money and was then asked to sign the release, being told "that it was only a matter of form," and that she thereupon signed it and Schmitt witnessed it. She stated that she never had had any business experience. She did not ask for an account because she thought that they would do what was right by her. That neither she nor Schmitt read the release.

Schmitt testified that he did not read the release.

The cashier of the defendant company testified that Mrs. Weiss asked for the balance of her husband's account and was requested to show her administration certificate. That the release was passed to her to read, and she signed it and passed it back and was then given the money. He also testified that he told her that it was a release in full, and that both Mrs. Weiss and Schmitt read it over.

It was claimed that the release was fraudulently obtained and was therefore not binding.

The evidence did not satisfy me that the cashier had misrepresented to Mrs. Weiss the contents of the instrument or its purport. She had ample opportunity to examine it and learn its contents.

The company and its officers, however, were knowingly conducting an illegitimate business.

The officers, and the cashier, must be presumed to have known of the liability of the company to repay the margins.

The nature of the receipt itself would tend to indicate this.

The cashier did not state to Mrs. Weiss the true facts, but led her to believe, if he did not openly state, that the amount paid to her was all that was due.

A failure on the part of an officer or employé of a corporation which was carrying on, to his knowledge, an illegitimate business to state all material facts to a customer who had been actively misled into believing that the business was legitimate and his rights duly protected is, in my opinion, such a fraud in fact and law as would avoid a release obtained from said customer.

The fact that the defendant company occupied a position in relation to its customers more or less of a fiduciary nature makes the concealment of the true facts still more culpable.

The plaintiffs had paid in as margins, from time to time, different amounts, and had, in some instances, drawn out cash.

The net balance due to each was as follows:

Ervan E. Chesley $3,996; G. R. Ellis $5,897.25; O. A. Ritzman $180.50; F. C. Rafter $560; H. F. Dowell $320; C. R. Coombs $4,043.40; Peter N. Campbell $18,467.31.

Carl Weiss had paid in $5,380 and had drawn out $327.50. Crediting his account with the amount paid to Mrs. Weiss, $164.62, the net balance due to her is $4,887.88.

It is agreed that the claim of the plaintiff Silberstein for $100 should be allowed, and that he had a preferred claim, inasmuch as the amount was paid in by him only a few minutes before the receivers took possession.

I also find, at the request of the plaintiffs, that at the time the receivers were appointed the entire assets of the defendant company did not exceed $150,000, and that the liabilities of the company to customers were over $500,000, whether such liability existed to repay to customers the excess of margins paid in and not drawn out or to pay them the amount which would have been due had the business, as conducted, been liquidated according to the books when the receivers were appointed.

I find, therefore, that the defendant company was insolvent.

I report, at the request of the defendant, that there was no evidence that the defendant had failed to meet its obligations in the ordinary course of its business prior to the appointment of the receivers. I did not consider the good will, if any, in stating the assets of the defendant, and there was no evidence offered that it had any value.

The defendant, after the hearings before me had been closed and the draft report had been submitted, for the first time requested me to report all the evidence.

I refused this request, inasmuch as the rule to the master did not direct me to report the evidence.

The defendant took the following exceptions to the admission of evidence:

The plaintiff offered in evidence the following conversation held by clerks of the defendant company with Stephen S. Fitzgerald, associate counsel for the receivers, who took possession, with others, of the company's premises:

The conversation and the conditions under which it was held was testified by Mr. Fitzgerald to be as follows:

The rooms taken possession of on the third floor were a storage room, a room occupied by clerks adjoining the storage rooms, and the room occupied by Mr. Lillis the other side of the room with the clerks. The room with the clerks in it had a blackboard on one side, a lot of tickers, and a number of clerks at the tickers. In the middle of the room was a long table on which there were a number of slips of paper and a man standing over them. Fitzgerald asked the clerks to stop doing business. They were writing out

figures on little slips of paper. He asked what the figures were, and they told him they were orders from the branch offices. On the middle of the table there was a lot of similar orders with figures in heavy pencil with a ring around them. Some of the clerks were writing out figures on a little blackboard which was given to them by a clerk at the end of the blackboard, who was reading from a tape. In the center of the room was a clerk who was examining the orders which were arranged in groups, and the orders which had been filled were separate from the orders which had not been filled. He looked at the blackboard and then down at the orders. Mr. Lillis was in his room, and the door between the rooms was open. He was clearly within earshot.

The defendant duly objected and excepted to the admission of the conversation contained in this testimony.

The testimony of two plaintiffs, Ritzman and Campbell, to the following effect, was admitted:

The plaintiff Ritzman, on direct examination, testified in part as follows:

"Q. On any of these purchases or sales of stock were you informed by the defendant company or by any of its officers or agents that they were not actually executing the order which you put in?

"A. No, sir.

"Q. So far as you knew they were executing the orders?

"A. Certainly.

"Q. You intended them to execute them?"

This question was objected to and admitted and exception duly taken.

"A. I never knew any difference."

The plaintiff Campbell, on direct examination, testified in part as follows:

"Q. Had you any reason to believe that they (the defendant corporation) were not actually buying and selling these stocks?

"A. No. I had no reason to believe but what they were buying them just as they stated.

"Q. What was your intention as to the execution of the orders, whether you intended that they should buy the stock when you told them to buy it?"

This question was objected to and admitted subject to the defendant's exception.

"A. I supposed that they would buy it, supposed they were buying it the same as I have dealt with other brokers, and they say they buy their stocks and have them on hand, hold them. I supposed they were doing the same thing."

The plaintiffs offered in evidence a conversation of the plaintiff Berry with Charles Weiss, the intestate of the plaintiff Anna L. H. Weiss in December, 1902, in substance as follows:

"Charles Weiss told me how money could be made in stocks and explained things to me. Mentioned how several men had made money and said the defendant actually bought shares on the Exchange in New York, and that they were held there by the banks, who lent money as collateral, and further that a uniform rate of interest at 6 per cent. was charged because they could not change the rate of interest every time the money market fluctuated."

The defendant objected and duly excepted to the admission of this testimony.

The defendant objected to the evidence of the plaintiffs other than Weiss, including those whose claims were subsequently withdrawn, as to their individual transactions with the defendant being considered as evidence in the Weiss case; there being no evidence that said transactions were known to Charles Weiss.

I admitted the testimony of these plaintiffs in the first instance as evidence necessary to prove the claim of each plaintiff and made no ruling as to its admissibility as evidence in the Weiss case. I subsequently considered and gave weight to it in the Weiss case only so far as it tended to show the general method of business which the defendant company was holding itself out to the public as conducting. The evidence apart from this testimony was, in my opinion, sufficient to warrant the findings which I made as to the apparent method in which the defendant conducted its business.

The plaintiff offered evidence as to the general methods of the business of the defendant corporation, some of which methods were not shown to have been brought to the notice of any of the plaintiffs.

The defendant objected and duly excepted to the admission of such evidence.

The plaintiff offered in evidence certain letters marked Exhibit 5, 6, and 7, which were as follows:

"April 24, 1905.

"Dear Bill: Nine interments here to day. Three suits started against us as a result of newspaper notoriety. Have engaged Al Shields to defend. We are in delicate position; if we confess gambling by stocks on margin which lets us out in this state. The d——n paper might encourage proceedings by the losers against us as a gambling house—if we defend regularly books may be made to be produced. I will defend with view to delay. The 'system' should take in some cash to-day and wipe out some obligations. I have recovered my serenity and am again 'on the perch.' N. A. to-day pursued Parrish & Co. members of Con. Looks as if charter would be annulled upon technicalities.

"As ever, G."

"Fahey was down and gone home again."

"Boston, Oct. 18, 1904.

"Mr. G. G. Turner & Mr. Harvey Watson: As far as possible when our customers attempt to draw cash against paper profits we endeavor to have them retain fair sized margins on their holdings, though it is not prudent to hold off in every case. It depends entirely upon circumstances, and where we think it desirable we explain our reasons in about the following way: It is hardly necessary to call your attention to this matter, as you undoubtedly are taking the same stand yourself, and you might perhaps be able to make some suggestion to us to add to the explanation.

"The fact that we try to exact more than the ordinary margins does not alter the distinctly bullish attitude we have maintained for many months, but when speculation broadens out to its present dimensions a broker has, for the protection of all his customers, to take a more conservative stand and must expect more than the usual co-operation from his customers. As stocks rise in value the sums required by the broker between the usual margin and the market cost to take on new lines increases enormously while banks insist upon a large security on loans, and furthermore, there are many issues, good ones too, which banks discriminate against and which a broker must lock up in his safe. As we do a tremendous business in fractional lots, it is an impossibility at all times to give an account the minute scrutiny it requires as to margins, and therefore, for our own protection as well as for our customers as a whole, stop loss orders have to be kept in and the usual courtsey of calling additional margins omitted in many cases. With an account amply margined the broker's lot is just so much easier as he has the opportunity to care for such accounts and give due notice if more funds should be required. Many promising accounts have been utterly sacrificed by exhaustion through slim margins during some sharp decline where co-operation with the broker would have carried them back on the rallies to their original condition. Our conservatism, which is an insurance to our customers, sometimes diverts business, but we would rather be sure than sorry. It has enabled us to keep continuously in business for a score of years with capital unimpaired, while houses which have undertaken to care for business on too small margins frequently dropped from the ranks; traders not only losing accrued profits but margins as well.

"The above line of argument, of course, would not apply to pyramiding, as you would undoubtedly be willing to accept trades of that nature on nominal margins.

"Yours truly."

"Philadelphia, Mar. 17, 1904.

"My Dear Bill: Your letters received and contents duly noted. I trust you will live up to the conclusions contained therein not only for the common benefit but for your own special good and health, as well.

"I don't know whether or not my scheme will stand water but I incline to the opinion that it will help some ——— in the shape that I have exhaustively outlined it to T. Fahey. You know my sentiments as to selling; anything that would let us out now with $300,000 each or more I would feel inclined to accept. You and I could go into some nice legitimate business together where, if the profits were not so large, they would be certain without molestation and with our capital to utilize in arbitrage, stock borrowing and carrying for interest, etc. I am sure we could without killing ourselves make it earn safely 15 per cent. per annum, which would not only keep the wolf from the door but keep us sufficiently occupied so as not to become rusty, and we could get three or four months each annually for traveling and pleasure as long as we were together knowing as we do that we can trust each other.

"There is always the fear in my mind that something might happen when markets are high to drive us out of business in which case it would be oblivion. I don't fear bull markets, but other things; hence my extreme willingness to listen to a good offer now. What can and will Rand's folks positively do and in what way will they guarantee to us the carrying out of their offer. It should be if accepted—Spot cash! Sorry you can't be on deck Friday. Am half inclined to run up to Boston Saturday night—meeting you there Sunday for a talk. Do the Fall River boats still run Sundays? I think the Met, Pattee and as many others as are good from Boston should be brought into alliance with H. & F. Loring, McLean and Labaree Baxter. Labaree and McLean have joined issues with H. & F. Loring. We between us could build up and make Con. Ex of Phila. safe and have a 'stock Co. of Names.' The Exchange would do well on clearances alone far more than paying expenses. It should be talked over. Note Labarees paper— 'member Con. Ex of Phila. and Correspondents of N. Y. Cotton Ex. N. Y. Coffee Ex. & Chi. Board of Trade.' How is that for nerve? If I don't see you there hope to hear from you in N. Y. These matters are well worthy of consideration for the common benefit of all interested. Together in some such manner we are a power—separately we are vulnerable and amenable to the law and the shyster lawyer.

"As ever,                                                   G."

The defendant objected and excepted to the admission of these letters. It was clearly proved that they were written by one of the officers of the corporation to another officer.

The plaintiff offered evidence of the manner in which the defendant conducted its business, including the literature and the letters above referred to, which was not shown to have been brought to the attention of said Charles Weiss.

The defendant objected to the admission of this evidence as evidence in the Weiss case. I considered and gave weight to the evidence only so far as if tended to show the apparent and actual method in which the defendant corporation conducted its business.

William P. Maloney; Asa P. French, George Hogg, and James S. Allen, Jr., for complainants.

I. R. Clark, G. F. Ordway, and Franklin Bien, for defendant.

LOWELL, Circuit Judge. Anna Weiss, the complainant, administratrix of Charles Weiss, filed this bill in equity in behalf of herself and all such other creditors of the defendant as should join therein. The bill alleged, in substance, that Charles Weiss had employed the defendant as broker to buy stocks on margin; that the defendant had deceived and defrauded Charles by pretending to do this as a legitimate broker, while in fact it carried on merely a bucket shop, and had made no real purchase of stocks. The bill further alleged the defendant's insolvency, its keeping of false and fictitious books of account, and the conversion of its property by its officers to the use of the latter. The

bill prayed for a receiver who should distribute the corporate property among the creditors.

James D. Colt was appointed receiver, and took possession of a large amount of property belonging to the defendant in this commonwealth. Like proceedings were begun in Connecticut, New York, and Pennsylvania, and considerable sums of money were taken by the receivers appointed in those states. Many persons, alleging themselves to be creditors of the defendant, have intervened, and have been made parties complainant in this proceeding. The defendant's answer, as amended, set out that it was not a bucket shop, but actually bought and sold stocks for its customers, including Charles Weiss. It set out further that it was not bound to make actual purchases of stock, and that Charles Weiss did not intend that any purchases should in fact be made; that he understood fully the nature of the business; that he, during his lifetime, and Anna Weiss, as his administratrix after his death, executed full releases to the defendant of all claims against it. The answer further denied insolvency and fraud. The case was referred to a master, who has reported in favor of the parties complainant on substantially all the issues raised. To this report the defendant has filed sundry exceptions.

Most of these exceptions may be disposed of summarily. The defendant objected that the master failed to report all the evidence, but this was not required by the order of reference, and is not usual. Objection was made to the master's use of the phrase "bucket shop" and "long" of stocks. The meaning of the report is plain. Objection was made to the master's finding of fraud, but the defendant's fraud was proved, not only by the general method of its dealings, as shown in evidence, but also by letters written by the persons who directed its operations. The letters were admissible in evidence. If the issue to be determined concerns the honesty or fraud of corporate dealing, letters written by those who control the corporation, which describe and characterize its fraud, may be given in evidence. The defendant had $150,000 of property, and owed $500,000, and therefore it was insolvent. The defendant objected that the master made no allowance for the good will of the business. As the defendant's officers characterized this business as that of a "gambling house" and as "vulnerable and amenable to the law," the master's omission was obviously necessary. That many, if not all, of the intervening creditors were deceived, and thus defrauded by the defendant, also appeared. It follows that a decree may be entered conformable in general to the prayer of the bill.

There remain only to consider certain exceptions relating to the original complainant Weiss. Whatever conclusion the court may reach regarding this claim, the decision of the case as a whole will be the same. The defendant contended in argument that Weiss knew that the defendant was merely a bucket shop, and so was not deceived or defrauded; therefore, that his administratrix cannot recover. It is to be noticed that the defendant set up in its amended answer: First, that its business with Weiss was that of a legitimate broker; and, second, that Weiss knew that the business was that of a bucket shop. The inconsistency of these defenses does not strengthen the defendant's position.

To support her contention that Charles Weiss was deceived by the defendant, the complainant offered the evidence of Berry, who testified to conversation with Charles Weiss, in which the latter asserted in effect that the defendant's business was that of a legitimate broker, and that stock was actually bought by the defendant. To the admission of this evidence the defendant objected, but its admissibility seems well settled by binding authority. The issue was Charles Weiss' knowledge of the defendant's business, the state of his mind upon the subject. To prove intention, knowledge, or other mental state the statements of the person in question are held admissible. In Mutual Life Insurance Company v. Hillmon, 145 U. S. 285, 12 Sup. Ct. 909, 36 L. Ed. 706, the issue concerned a journey alleged to have been taken by Walton, who was a party to the suit. The letters of Walton stating his intention to take this journey were admitted against objection. Whether Walton was living or dead at the time of trial was uncertain. His previous intention to take the journey in question made the journey more probable, and his statement of intention was admitted for the ultimate purpose of proving that the journey was taken. So, in Commonwealth v. Trefethen, 157 Mass. 180, 31 N. E. 961, 24 L. R. A. 235, the statement of a person deceased that she intended to commit suicide was held admissible to prove that she had killed herself and so had not been murdered by the defendant. These cases go further than this court is required to go in the case at bar, for in them the statement of intention was used to prove the doing of the act intended. The speaker's mental condition was irrelevant, except so far as it tended to prove the doing of the physical act. In the case at bar, the opinion or knowledge of Charles Weiss was the ultimate fact to be proved, and to prove it his statements regarding his knowledge or opinion were admissible. Lake Shore Railway Co. v. Herrick, 49 Ohio St. 25, 29 N. E. 1052.

The defendant further objected that the receipts, signed first by Charles, later by Anna, released the defendant from the cause of action here sued on. The master was of opinion that they released only the special right of recovery given by Rev. Laws Mass. c. 99; but they are of broader scope, and were expressed to release all Weiss' claims against the defendant connected with these transactions.

The complainant contended these receipts were obtained by the defendant's fraud. Upon the whole, considering that Weiss had been deceived by the defendant, and that he supposed that the defendant was doing a legitimate business, considering the incongruous and disreputable character of the defense set up in the answer, and the relation of the parties, I do not think it is going too far to hold that the releases given by Charles Weiss were obtained by fraud, and I have less doubt on this head regarding the releases which were signed by Anna Weiss.

The receiver has asked for an allowance on account for himself and for his counsel. The circumstances are extraordinary. The exceptional energy and vigilance of the receiver and his counsel have secured large sums of money for the creditors of this fraudulent gambling house. The litigation has been long and has been hard fought, and the compensation of an officer of the court should not be postponed

until the decree of distribution. I shall allow on account $5,000 to Mr. Colt, the receiver; $5,000 to Mr. Turner, his principal counsel; and $1,000 to Mr. Fitzgerald, who has rendered valuable and necessary services in a subordinate capacity. Counsel for the complainant has also asked for an allowance, but this should be deferred until distribution.